```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF OHIO
                      EASTERN DIVISION
```

Peggie J. Carter,                 :

       Plaintiff,               :

    v.                          :    Case No. 2:13-cv-0555

                                              :    JUDGE EDMUND A. SARGUS, JR.
Commissioner of Social Security,       Magistrate Judge Kemp
                                              :

       Defendant.

<u>REPORT AND RECOMMENDATION</u>

I. <u>Introduction</u>

Plaintiff, Peggie J. Carter, filed this action seeking review of a decision of the Commissioner of Social Security denying her application for disability insurance benefits. That application was filed on October 26, 2009, and alleged that Plaintiff became disabled on June 2, 2008 (later amended to May 1, 2009).

After initial administrative denials of her application, Plaintiff was given a hearing before an Administrative Law Judge on May 17, 2012. In a decision dated June 8, 2012, the ALJ denied benefits. That became the Commissioner's final decision on April 23, 2013, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on September 5, 2013. Plaintiff filed her statement of specific errors on November 7, 2013. The Commissioner filed a response on February 6, 2014. No reply brief has been filed, and the case is now ready to decide.

II. <u>Plaintiff's Testimony at the Administrative Hearing</u>

Plaintiff, who was 47 years old at the time of the administrative hearing and had earned her GED, testified as follows. Her testimony appears at pages 15-38 of the

administrative record.

Plaintiff was first asked about her RSD (reflex sympathetic dystrophy syndrome). She said she had the condition in both legs and it caused severe pain to the point where she had to lie down. That occurred on an almost daily basis and had been that way for three to four months. The condition began in 2008, and worsened in her left leg when she had knee surgery. She was being treated by a spinal cord stimulator, which did not provide much relief, and with pain medication and muscle relaxants.

Plaintiff had had both knees replaced. She still experienced swelling in her right knee, and her RSD interfered with her rehabilitation of the knee. She could not do any rehabilitation on her left knee after it was replaced due to pain from RSD. She had both pain and swelling in that knee. She used a cane to walk. She needed a walker to climb up two steps in her home.

A number of years before, Plaintiff had neck surgery. She still had neck pain, made worse by changes in the weather. Plaintiff had also had ankle surgery to repair a fracture, and had some continuing problems with the ankle, causing her to wear an ankle brace three or four times per month. She had been seeing a counselor for depression but stopped doing so for financial reasons. Her family doctor prescribed an antidepressant for her. She experienced crying spells and sadness.

Plaintiff also described having had a seizure which resulted in her being hospitalized for more than two weeks. She had a second episode as well which caused another lengthy hospitalization. She was taking medication, which seemed to help.

As far as activities are concerned, Plaintiff said she could stand for fifteen or twenty minutes before needing to lie down,

and she could walk less than half a block. Sitting hurt both her back and her legs, and she could not sit for more than 30 minutes. Her pain management doctor advised her to elevate her legs when she sat. She could not do routine household chores and left the house infrequently, going either to see doctors or to the grocery store. She spent most of each day in her room either reading or watching television.

### III. The Medical Records

The medical records in this case are found beginning on page 218 of the administrative record. The pertinent records - those relating to Plaintiff's physical condition, and particularly her leg and back issues, because most of her Statement of Errors focuses on these conditions - can be summarized as follows.

Plaintiff underwent a total body bone scan on June 22, 2009. That test showed mild arthritic changes in both knees, but it was otherwise unremarkable. (Tr. 249). A subsequent MRI of the lumbar spine indicated mild disk degeneration at L3-4 and some mild foraminal narrowing at L5-S1. (Tr. 250). The records also show that, about three years before her alleged onset date, Plaintiff had a fusion performed at the C6-7 level, and had her right ankle repaired in 2008.

In 2009, Plaintiff was referred to a specialist by Dr. Payne, her treating physician, based upon reports of leg pain. Plaintiff told the specialist, Dr. Gallanosa, that she had such pain for years but it worsened after a motorcycle crash in 2008. She had undergone gastric bypass surgery and had lost weight but the pain persisted. Her gait was antalgic, with a preference for her left leg, but her neurological examination was normal. An EMG was planned. It was performed a few days after she saw Dr. Gallanosa and showed mild L5 radiculopathy on the left side; the findings were deemed "insufficient to account for pt's symptoms." (Tr. 370-74).

The next series of records are office notes from Dr. Payne. They show complaints of leg cramps and pain beginning as early as September, 2008 (Tr. 383), which, by October, 2009, was described as "some days so bad has trouble walking." (Tr. 391). Treatment included narcotic pain relievers and Flexeril. By December of 2009, Plaintiff was also reporting severe back pain (Tr. 393). She had been sent to another consulting physician, Dr. Taylor, in June, 2009, who thought her symptoms were consistent with restless leg syndrome due to an iron deficiency. (Tr. 530-33).

Plaintiff underwent total right knee replacement in February, 2010. At that time, one of her diagnoses was chronic pain syndrome. Shortly afterward, she was evaluated by Dr. Donaldson, a psychologist, and reported to him that she was in constant pain and it had taken over her life. She said her mood depended on her pain level and that she engaged in "no activities," describing her routine as attempts to do some cooking and cleaning but no laundry, trying to go to church, seldom shopping for groceries, and leaving the house twice a week. (Tr. 552-55). By June 14, 2010, she was doing "reasonably well" with her knee, although she was still walking with a slight limp. The assessment done that day included "Lack of rehabilitation, right knee with continued pain." She was encouraged to continue with physical therapy. (Tr. 788-89). She sought emergency room treatment for leg pain in July, 2010, and told Dr. Payne three days later that her legs were worse. (Tr. 862). By that time, she was back on pain medication, including Vicodin.

Plaintiff was hospitalized following a seizure on March 31, 2010, and remained in the hospital until April 14, 2010. According to a note written by Dr. Payne, Plaintiff's discharge diagnoses included metabolic encephalopathy, acute respiratory failure, metabolic acidosis, various infections, and restless leg

-4-

syndrome, among others. She was discharged on anti-seizure medication (Keppra) and was to follow up with various specialists. (Tr. 564-65). She discontinued her prescription pain medications shortly after being discharged and said during a follow-up evaluation on June 6, 2010, during which she reported additional seizure-like episodes, that she was "trying to avoid going back on a lot of medications." (Tr. 771). At that time, her gait was normal. Her dosage of Keppra was increased. She had another such hospitalization in January, 2011, which might have been caused by overdosing on her pain medications, and was still having some possible breakthrough seizures as of June, 2011. (Tr. 1005-06). At that point, Dr. Yao, who was treating the seizure disorder, thought that plaintiff could do low stress work but would miss one day a month due to seizures. (Tr. 1011-15).

Dr. Payne had also referred Plaintiff to Dr. Perkins, a pain management specialist. In September, 2010, he reported that Plaintiff walked with a slightly antalgic gait, had pain with range of motion of the right hip, and said she had anterior thigh pain. He discussed various treatment options with her at that time. Her legs were still hypersensitive when he saw her next, in October, 2010, and he noted that she had some improvement with a TENS unit and was also on medications and using a Lidoderm patch. He recommended a bone scan to evaluate for RSD as well as another EMG study. The bone scan did not show evidence of RSD. The EMG study was done on November 17, 2010, and was completely normal, with no evidence of lumbosacral radiculopathy, plexopathy, distal entrapment neuropathy or generalized large fiber peripheral neuropathy. (Tr. 917-18). In December, 2010, Dr. Perkins noted continuing sensitivity about Plaintiff's legs, and his impression was complex regional pain syndrome. He recommended a diagnostic lumbar sympathetic block. Reporting

again in March, 2011, Dr. Perkins said that Plaintiff was pain-free for 48 hours following the block but then the pain returned, and continued despite her taking Dilaudid and Vicodin as well as Gabapentin. He thought the next step was a spinal cord stimulator trial. By May, 2011, the trial had been completed, and Plaintiff reported a 70% improvement in her right leg as well as improved sleep. (Tr. 988-99). At her next visit to Dr. Perkins, Plaintiff had various symptoms which he believed to be "consistent with chronic reflex sympathetic dystrophy," with progressive worsening bilateral leg pain, and he recommended permanent implantation of a spinal cord stimulator. (Tr. 1035-38).

Plaintiff had the stimulator permanently implanted on August 1, 2011, as treatment for "a 3-year chronic history of bilateral lower extremity pain, right-sided pain and parasthesia and dysesthesia due to reflex sympathetic dystrophy as well as chronic restless leg syndrome and chronic radiculopathy and neuropathy," with a note that she had been "under chronic pain management as well as had had physical therapy as well as steroid injections ...." (Tr. 1025). Three weeks after the surgery, Dr. Perkins advised Dr. Payne that Plaintiff was enjoying adequate relief of her symptoms with some back pain which Dr. Perkins believed to be myofascial. Plaintiff was still reporting relief as of September, 2011, but in October she had had to increase the intensity of the pulse generator to deal with her symptoms. By December, her pain had increased again, and she was still taking Dilaudid and Vicodin and using a Lidoderm patch. Her pain increased with activity and decreased with sitting. (Tr. 1055). On March 28, 2012, Dr. Perkins reported that plaintiff was having a hard time tolerating physical therapy for her left knee replacement and that the stimulator was not as effective as it had been. Even with medication, she reported her pain level as

7/10. (Tr. 1094-95).

Dr. Perkins completed a document titled "Effective Ambulation Medical Questionnaire" in October, 2011, noting that he thought Plaintiff could only be on her feet for two hours during a workday and could walk sufficiently for activities of daily living only with frequent rests. She could not walk a block on rough or uneven surfaces and could not do routine activities such as shopping and banking. He said he had advised her to use a cane, and thought she should keep her feet elevated while sitting. (Tr. 1051-52).

Plaintiff had her left knee replaced in 2012 due to end-stage degenerative joint disease with pain and limp. Dr. Gittens, the surgeon who did the knee replacement, also filled out an ambulation questionnaire, indicating that as of May 15, 2012, Plaintiff could not work because she had limited weight bearing and was unable to drive. He did not think she could do even sedentary work within the next twelve months and that she could not walk well enough to use public transportation or do activities like shopping and banking. (Tr. 1072-73).

Dr. Payne, who had been Plaintiff's primary care physician throughout, completed a physical capacity evaluation form on May 12, 2012. She listed the diagnoses as status post cerebral vascular accident and seizures, chronic low back pain, RSD, and arthritis in both knees and ankles. Dr. Payne thought Plaintiff had very limited lifting ability (1-2 pounds), could stand, walk, and sit for less than thirty minutes each during a work day, needed to use an assistive device to walk and balance, needed to lie down frequently during the workday, and could never crouch or climb ladders. She would also have difficulty with her balance even on level terrain. (Tr. 1068-70).

-7-

There are three assessments of Plaintiff's physical capabilities done by state agency physicians. First, on March 23, 2010, Dr. Cruz expressed the opinion that, six months post surgery, Plaintiff should be able to perform a range of light work with some restrictions on climbing - although she could climb even ropes, ladders or scaffolds occasionally - and she would not be able to crouch or crawl. Dr. Cruz found Plaintiff's statements to be "credible." (Tr. 544-51). Dr. Bolz completed a case analysis form on July 12, 2010, affirming that assessment, except he would have limited Plaintiff to "no ladders, ropes and scaffolds or heights, hazards, or commercial driving" due to her seizure disorder. (Tr. 839). Finally, Dr. Klyop noted, on January 28, 2011, that he affirmed both earlier evaluations (not indicating how he resolved the conflict between them) and found Plaintiff only partially credible because she claimed to have RSD but the tests ruled that out. He also noted "No tx. source statements." (Tr. 981).

### IV. The Vocational Testimony

A vocational expert, Mr. Hartung, also testified at the administrative hearing. His testimony begins at page 38 of the record.

Mr. Hartung testified that Plaintiff's past work as a daycare instructor was (according to the DOT) a light, semi-skilled job, but he believed it was performed at the unskilled level. Her position as a training instructor is listed in the DOT as skilled and light, but he though Plaintiff had performed it at the semiskilled level. Plaintiff had also worked as a billing specialist, a semi-skilled sedentary job, and as an appointment clerk, which was the same.

Mr. Hartung was then asked some questions about a hypothetical person who could work at the light exertional level, but who could not crouch or crawl, could only occasionally climb

ladders, ropes, or scaffolds; could occasionally kneel; and could frequently stoop and climb ramps or stairs. According to Mr. Hartung, that person could perform all of Plaintiff's past relevant jobs. If the person were further limited, having the ability to understand and remember simple and some complex instructions, being able to tolerate the public, coworkers, and supervisors with limited interpersonal demands in an object-focused work setting, and not being subjected to critical production quotas, those jobs could not be done. However, there were unskilled light jobs which such a person could perform, such as general office clerk, file clerk, cashier, and rental clerk.

Mr. Hartung was then questioned by Plaintiff's counsel. He was given a hypothetical where the person was limited as described by the ALJ but also could walk or stand only one or two hours per day, could not work at heights or around dangerous machinery, could not operate a motor vehicle, and would need a cane to ambulate. Such a person could not, according to Mr. Hartung's testimony, do light work, but could do a full range of sedentary work. However, elevating one's feet would not be allowed in the workplace. Being off task for ten percent of the workday would also not be tolerated.

### V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 79-91 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff meets the insured requirements for disability benefits through June 30, 2014. Next, Plaintiff had not engaged in substantial gainful activity from May 1, 2009 forward. As far as Plaintiff's impairments are concerned, the ALJ found that Plaintiff had severe impairments including reflex sympathetic dystrophy; degenerative disc and joint disease with arthritis; chrondromalacia, small joint effusion and osteophytosis with

related arthroscopy with chondroplasty; history of right ankle fracture; epilepsy/seizure disorder with history of respiratory failure; complex regional pain syndrome; history of cerebral vascular accident; and affective and anxiety-related disorders. The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at the light exertional level with these restrictions: she could never crouch or crawl; she could occasionally kneel and climb ladders, ropes, or scaffolds; and she could frequently stoop and climb ramps and stairs. She also could understand, remember, and complete simple and some complex tasks, sustain attention to complete repetitive tasks where production quotas were not critical, could tolerate coworkers and supervisors with limited interpersonal demands in an object-focused, nonpublic work setting, and could adapt to routine changes in a static work setting. The ALJ found that, with these restrictions, Plaintiff could not perform her past relevant work, but she could perform the light, unskilled jobs identified by Mr. Hartung, and that such jobs existed in significant numbers in the regional and national economies. Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

VI. <u>Plaintiff's Statement of Specific Errors</u>

In her statement of specific errors, Plaintiff raises these issues. She contends that (1) the ALJ did not rely on substantial evidence to formulate her residual functional capacity; and (2) the ALJ failed to give appropriate weight to the treating source opinions, particularly those of Drs. Perkins and Payne. The Court analyzes these issues under the following standard.

<u>Standard of Review.</u> Under the provisions of 42 U.S.C.

-10-

Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

Plaintiff's two claims of error, although stated separately, really raise a singe issue about whether the ALJ properly assessed her residual functional capacity when that assessment deviated significantly from the views of all of the treating sources. As in any case where the sufficiency of the ALJ's decision to reject a medical opinion is at issue, the Court begins with a fairly detailed summary of the ALJ's reasoning. This is what he said on the subject.

After recapping Plaintiff's testimony and finding it "not credible to the extent [it was] inconsistent with" the ALJ's

residual functional capacity, the ALJ then summarized the
opinions of the three state agency reviewers - also not resolving
the differences between Dr. Cruz's and Dr. Bolz's opinions - and
found that Plaintiff could not do medium work but could "perform
light work with the above-enumerated limitations" - apparently
those found in Dr. Cruz' March, 2010 evaluation.  (Tr. 86-87).
Recognizing that all of these assessments predated some of the
record evidence, the ALJ said - without much further explanation
- that none of that evidence provided "any credible or
objectively supported new and material information that would
alter the [state agency's] findings concerning her limitations."
(Tr. 87).

  The ALJ then briefly discussed Dr. Yao's report, finding
that it was not credible to the extent that it suggested
Plaintiff would miss one day of work per month due to her seizure
disorder.  That part of the opinion was discounted because
Plaintiff testified she had not had a seizure since being on
medication and because her hospitalizations might have been
related to a prescription drug overdose.

  That left the reports from Drs. Payne, Perkins, and Gittens.
The ALJ devoted this paragraph to their opinions:

> In October, 2011, Robert Perkins, M.D., concluded that
> the claimant required a cane to assist with ambulation,
> needed to keep her feet elevated when sitting and could
> not walk on uneven surfaces or carry out routine
> ambulatory activities such as shopping and banking....
> In May 2012, Melissa Payne, M.D., assessed a function
> capacity for a substantially reduced range of sedentary
> work that could not be performed on a sustained basis
> ....  In addition, in May 2012, Mark Gittens, D.O.
> indicated that the claimant would be unable to engage
> in any significant activities, including work, while
> recovering from her total left knee replacement surgery
> ....  I find that these assessments are entitled to
> little weight, as they are not fully supported by the
> objective medical evidence of record, are highly
> dependent upon the reports of symptoms and limitations
> by the claimant, who is not wholly reliable, are not by

-12-

> sources shown to be familiar with SSA and occupational
> standards, and are not consistent with the credible
> portion of daily living evidence.

(Tr. 88). The only clarification given to this last statement appears on the following page, where the ALJ, after noting that Plaintiff had testified to a "relatively inactive lifestyle," referred to her statement to Dr. Donaldson, made in March, 2010, "that she got along adequately with neighbors, sometimes cooked, tried to attend church services, seldom shopped for groceries, left her home twice a week, and had one friend," as "not consistent with the level and persistence of symptoms she alleged." (Tr. 89).

It does not require much analysis to appreciate the inadequacy of the ALJ's rationale for preferring the opinions of non-treating, non-examining sources over those of Plaintiff's three treating physicians. Taking the reasons given by the ALJ in reverse order, the only statement he relied on to suggest that Plaintiff's activities of daily living were not consistent with the treating source opinions was a statement she made a year and a half before Dr. Perkins' report, and more than two years before Dr. Payne and Dr. Gittens commented on her physical abilities. Even that statement, which preceded the progressive worsening of her condition, as documented by the medical evidence, and her second total knee replacement, does not indicate a level of daily activity much greater than what the physicians described, but even if it did, a reasonable person would not have viewed it as a reliable indicator of her condition in either October, 2011 or May, 2012.

Next, the ALJ observed that the record did not affirmatively show that any of these three sources were "familiar with SSA and occupational standards." Plaintiff specifically argues in her Statement of Errors (Doc. 15, at 18) that "the treating physician rule [20 C.F.R. §404.1527(c)(2)] ... contains no requirement that

-13-

doctors need to be familiar with agency standards." The
Commissioner's opposing memorandum is completely silent on this
issue. That is likely because Plaintiff is correct; nothing in
any regulation or ruling (particularly §404.1527(c) and SSR 96-
2p) permits a treating source's opinion about a claimant's
physical capability to be discounted for that reason, nor is
there any requirement that a claimant offer evidence that the
treating sources who have offered opinions have that familiarity.
Further, whether someone has the physical ability to stand, walk,
or sit for any particular period of time, to lift particular
amounts of weight, or to engage in activities like crouching,
crawling, kneeling, stooping, bending, balancing, or climbing,
does not depend on how one interprets either Social Security
regulations or occupational standards. It is a medical judgment,
and the applicable regulations make that clear. See 20 C.F.R.
§404.1527(a)(a "medical opinion" includes a physician's statement
not only about "symptoms, diagnosis, and prognosis" but also
"what you can still do despite impairment(s), and your physical
or mental restrictions"). Thus, the ALJ's reliance on this
factor cannot constitute a "good reason" for discounting these
three opinions, as required by §404.1527(c)(2).

    The only remaining part of the ALJ's rationale is his
statement that the treating source opinions, collectively, "are
not fully supported by the objective medical evidence of record
[and] are highly dependent upon the reports of symptoms and
limitations by the claimant, who is not wholly reliable ...."
The second part of this statement is clearly contradicted by the
record. It is hard to imagine a record containing a more
thorough workup of a patient than this one. Dr. Payne referred
Plaintiff to multiple pain specialists. She had bone scans,
MRIs, EMGs, underwent multiple physical examinations, and was
prescribed a host of treatments, including strong pain
medication, injections, and even a permanent spinal cord

stimulator, all without any lasting relief.  She also had two
total knee replacements during the time that her application was
under consideration.  Although certain disease processes were not
confirmed by testing, that did not stop her physicians from
diagnosing conditions like RSD and complex regional pain syndrome
(CRPS) and treating her aggressively for those conditions.  And
it should be pointed out that RSD/CRPS is a recognized medical
disorder and that SSR 03-2p (which does not appear to be
mentioned in the ALJ's decision) does not require it to be
confirmed with tests like EMGs or bone scans, but places great
reliance on "longitudinal clinical records reflecting ongoing
medical evaluation and treatment from the individual's medical
sources, especially treating sources ...."  This is simply not a
case where it is reasonable to infer that all of the treating
sources - including Dr. Gittens, who certainly had objective
evidence of the conditions leading to Plaintiff's last knee
replacement and the progress she was making during rehabilitation
of her knee - based most of their diagnoses, treatments, and
opinions on unsubstantiated reports from the Plaintiff.

   Lastly, the wholly conclusory reference to inconsistencies
between all of these opinions - again, treated as a group without
any effort to analyze them separately - and "the objective
medical evidence of record" - is the type of justification which
has been rejected time and again as insufficient under
§404.1527(c)(2).  SSR 96-2p, quoted in Blakley v. Comm'r of
Social Security, 581 F.3d 399, 406-07 (6th Cir. 2009), states
clearly that the "good reasons" an ALJ must give for assigning
less than controlling weight to opinions of treating sources
"must be 'supported by the evidence in the case record, and must
be sufficiently specific to make clear to any subsequent
reviewers the weight the adjudicator gave to the treating
source's medical opinion and the reasons for that weight.'" Here,
as in Wisecup v. Astrue, 2011 WL 3353870, *8 (S.D. Ohio July 15,

-15-

2011), adopted and affirmed 2011 WL 3360042 (S.D. Ohio Aug. 3, 2011),  "the ALJ merely hinted at a single regulatory factor - inconsistency — without providing any meaningful insight into the inconsistencies he saw.  He did not identify a single inconsistent piece of medical evidence ...."  That error is compounded in this case by the fact that the ALJ gave almost no weight to the opinions of three separate treating sources, each of whom treated Plaintiff for different conditions or, as to Dr. Payne, for her total condition, without citing to a single portion of the medical record which was inconsistent with any of their opinions.  In fact, most of the medical records came from these three sources.  The most glaring inconsistency is between their opinions and those of three state agency reviewers, but that, of course, cannot provide the basis for choosing the non-examining physicians' opinions over those of the treating sources.  See, e.g., Gayheart v. Comm'r of Social Security, 710 F.3d 365, 377 (6th Cir. 2013)("Surely the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors.  Otherwise the treating-physician rule would have no practical force ..."). And, as Plaintiff points out, the opinion which the ALJ appears to have adopted in full - that of Dr. Cruz - was rendered well before the bulk of the medical evidence in the record even existed, and none of the state agency reviewers had the benefit of the treating source opinions or any treatment records from 2011 and 2012, including the records of the second knee replacement which formed the basis for Dr. Gittens' opinion.  The Court of Appeals, in Blakley, supra, at 409, cautioned against giving greater weight to such opinions, requiring an ALJ to consider the new evidence when evaluating them.  The ALJ in this case paid lip service to that concept but his one-line assertion that nothing in those records cast any doubt on the opinions of the state agency reviewers is impossible to evaluate due to its

-16-

lack of specificity and, in any event, not reasonably supported by the record.

The ALJ's failure to adhere to the "good reasons" requirement found in §404.1527(c)(2), by itself, justifies a remand for compliance with the applicable regulations. As the Court of Appeals stated in <u>Wilson v. Comm'r of Social Security</u>, 378 F.3d 541, 545 (6th Cir. 2004), quoting approvingly from <u>Halloran v. Barnhart</u>, 362 F.3d 28, 33 (2d Cir. 2004), "[w]e do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion." A remand will give the ALJ the opportunity to apply the balance of the §404.1527(c)(2) factors to the opinions of any treating sources whose views are not given controlling weight, <u>see Wilson, supra</u>, at 546, something also not apparent from the record in this case. It will also permit the ALJ to consider the applicability of SSR 03-02p and to address the other matters set forth in this Report and Recommendation, all of which demonstrate that the current decision was neither supported by substantial evidence nor made in compliance with applicable law.

## VII. <u>Recommended Decision</u>

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be sustained to the extent that this case be remanded to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

## VIII. <u>Procedure on Objections</u>

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).

A judge of this Court shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

    The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation <u>de novo</u>, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. <u>See Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

                                                    /s/ Terence P. Kemp
                                                    United States Magistrate Judge